OPINION
Johnny M. Dunn appeals the Montgomery County Common Pleas Court's judgment convicting him of one count of involuntary manslaughter with a gun specification, and one count of intimidation of a witness. Dunn was sentenced accordingly, and he now appeals.
Jacques Olverson was shot and killed outside the Otterbein apartment complex on October 15, 1996. On October 25, 1996, Dunn was indicted by the Montgomery County Grand Jury on one count of involuntary manslaughter and two counts of intimidation of a witness, with a gun specification attached to each count. Dunn filed a notice of alibi on January 6, 1997, and a jury trial commenced on January 13, 1997.
During voir dire, it became apparent that certain issues pertaining to the venire caused Dunn concern. Dunn raised objections with the trial court about the jury pool available to him, but to no avail. The trial commenced on January 13, 1997.
At trial, it was determined that at approximately 8 p.m. on October 15, 1996, Delores "Sissy" Perry, who resided in an apartment at 3669 Otterbein, went out the back door of her apartment to smoke a cigarette. Once outside, Perry saw Damian "Tater" Jones walk from the front courtyard to the side of her building and take a bottle from the trash. Perry walked into her apartment and onto her front porch, where she saw Jones speaking with several other people. She then saw Olverson drive onto a driveway into the apartment complex, park his car, and approach the group. Dunn, who was standing outside the adjacent building, started moving toward the group. Jones threw the bottle at Olverson because he had been driving "fast and crazy," and the bottle landed on the ground. Dunn, who was nearly hit with the bottle, shouted to the group "Who threw the damn bottle at me?" Jones laughed at Dunn, and the two began bantering back and forth, with Jones becoming increasingly argumentative. According to Perry, Jones told Dunn that Olverson had thrown the bottle at him.
Jones stated that Olverson began "cracking on" Dunn, and the pair joked back and forth. Jones provided a statement to Detective Larry Davis after the incident that Olverson had shouted to Dunn, who wore a medallion reflecting his nickname of "Junk Yard Dog," that "you ain't nothing, you think you're a dog, nigger, you're all bark and no bite." Additionally, Det. Davis stated that Jones had told him that as Dunn left the group, he turned to Olverson and stated that he "would be back."
Jannie Yarbrough, who lived at 3671 Otterbein, testified that she had been cooking dinner at approximately 8 p.m. when she had heard the commotion in the courtyard outside her window. Yarbrough looked out her window and saw a group of males, including Olverson and Dunn. She heard Dunn become upset at someone throwing a bottle at him. Despite Dunn's demand to know who threw it, Olverson used profanity and replied that he didn't throw it and that no one had to tell Dunn who did. Yarbrough heard Olverson tell Dunn that he could not "hang with the big dogs [i.e. `the big boys selling drugs']" and that he was "all bark and no bite." Yarbrough detected a hostile tone between Dunn and Olverson, and she heard Dunn tell the group that he would "be back."
Several other witnesses testified to their observations of the exchange between Dunn and Olverson. Rahsian Sargent, Jones' cousin, was in the group outside Otterbein and witnessed Dunn approach the group inquiring who threw the bottle at him. He heard Olverson state to Dunn "nigger, ain't nobody throw no damn bottle at you." According to Sargent, Dunn grinned a little, but when Olverson continued to "crack on" Dunn, Dunn became more serious and eventually left.
After Dunn left the group, Yarbrough went back into her kitchen to finish dinner. Shortly thereafter she heard someone outside shout "Johnny's back" and she heard a shot; someone immediately yelled "He got a gun, he got a gun," and she heard people running. After the shot, Yarbrough heard Dunn say "now who can't hang with the big dogs?"; Olverson immediately replied "why me?" and Yarbrough heard a car peel out from the complex.
Rowe testified that she had been cooking dinner for herself, her daughter Kiona, and Kiona's boyfriend, Tater, in her apartment when she had heard the gunshot. She rushed to her front door as Olverson ran into her apartment. Rowe tried to push Olverson back out of her apartment, in fear that he was endangering her and her children's lives. Olverson pushed by her and fell onto her couch, holding his neck and bleeding and stating "Neece, I'm dying, I'm dying, I'm getting ready to die." Yarbrough ran into Rowe's apartment and she also heard Olverson state that he was "gonna die." Jones and Rowe stated that someone asked Olverson who had shot him, and he had replied "Johnny." Rowe called 911 and Rowe and Yarbrough carried Olverson out to the porch.
Perry was told by Kiona Rowe that Olverson had been shot. As Perry left her apartment for Rowe's, Perry saw Dunn enter his light blue Oldsmobile station wagon and she heard him yell in the direction of Rowe's apartment "now that's what you get for fucking with the JYD." Incidentally, Rowe testified that as they had waited for the paramedics to arrive, Perry had looked through Olverson's pockets and had taken some of his money. By the time the paramedics arrived, Olverson was lifeless and unresponsive. Later in the evening, Yarbrough went in search of crack cocaine, and as she walked back to her apartment, she heard Dunn state that if anyone turned his name into the police, he "would be back to spray [i.e. `shoot up'] the whole building."
None of the witnesses testified that they had seen Dunn with any kind of weapon. However, when the police arrived at the scene, a broadcast was placed to apprehend Dunn who was driving a light blue Oldsmobile station wagon.
Dunn was apprehended at a gas station in the early hours of October 16, 1996 by Officer Earl Brackett. Officer Brackett originally recognized Dunn's station wagon as it had passed through the intersection of Catalpa and Siebenthaler in Dayton. Dunn began driving very fast, as if to elude Officer Brackett. Dunn pulled into a residential neighborhood while Officer Brackett stopped at a stop light. Officer Brackett followed Dunn into the plan, knowing that there was only one entrance and one exit. Officer Brackett parked his cruiser in a driveway and had turned off his lights. Eventually, Officer Brackett saw the paneled station wagon creep out of the neighborhood with its lights off. Officer Brackett followed Dunn, and waited across the street as Dunn refueled at a gas station. When Dunn was almost finished refueling, Officer Brackett activated his lights and apprehended Dunn.
Officer Antonio Morlan heard Officer Brackett radio for backup, and assisted in Dunn's stop and arrest. Officer Morlan performed a general inventory of Dunn's vehicle, called for a tow truck, and waited with Dunn's vehicle until the tow truck had arrived. Officer Morlan stated that he had found a plastic bag on the floor of Dunn's vehicle that had contained jeans and a shirt, a coat had been on the back seat, and another bag had been found on the rear passenger seat that had contained six pairs of tennis shoes and baseball hats. Additionally, there was a suitcase on the back seat that contained five pairs of pants, underwear, socks, and a shaving kit. Officer Morlan did not discover any weapons during his inventory.
Dunn was questioned by Det. Davis later that day. Dunn denied any knowledge of the shooting, and stated that during the evening of October 15, 1996, from approximately 5 p.m. to 11 p.m., he had been with his girlfriend, Ebony Burks. Burks was brought into the station for questioning the next day, but she did not confirm Dunn's story.
Burks testified at trial that she had not been aware of the murder until she had been approached by Det. Burke to file a statement. She testified that on October 15, 1996, Dunn awoke at approximately 8:30 a.m. and left her apartment. When he returned at approximately 4 p.m., the couple went to Burks' parents' home to do laundry. With the exception of a fifteen minute trip home to get more clothes, Dunn remained with Burks until approximately 7 p.m. Dunn left at approximately 7 p.m. and returned again to Burks' parents' home at approximately 9 p.m. Upon his arrival, Dunn told Burks that he "got into it with somebody at a drive-through." She inquired as to what had happened, asking if Dunn had "beat him up," and Dunn replied, "No, worse. I disciplined him."
According to Burks, Dunn was scheduled to go to Akron, Ohio, the following day to visit his brother, Thomas Dunn, Jr. for an "Oldies but Goodies" concert. She stated that Dunn was going to Akron for only a few days, and that he was supposed to return to be with her on Sweetest Day. Dunn awoke at Burks' early in the morning of October 16, 1996, packed approximately three days worth of clothes in his bags, and left. According to Burks, Dunn left her apartment at approximately 1 a.m. on October 16th, and he called her two hours later from jail to tell her that the police would be contacting her. He stated to her that he had told the police officers that he had been with her, and he instructed her to "tell them the truth" because what she had to say would "help him out" and that "[h]is future was in [her] hands." Burks testified that during her interview, she had explained to the officers that she did not lie for Dunn as he had asked because "he was not worth me lying for." However, Burks, at Dunn's instruction, did go to the impound lot sometime later that week and had removed Dunn's belongings from the car so they would not be "stolen."
Deputy Coroner and Forensic Pathologist David M. Smith, who had performed the autopsy on Olverson, testified that Olverson had suffered gunshot entrance wounds one and a half inches above the left side of his collarbone, and just left of his midline. The bullet traveled straight through Olverson's body, from front to back, and exited his upper back just to the left of Olverson's midline. In its travel, the bullet pierced Olverson's major artery and vein and entered his lung, resulting in the deposit of more than two quarts of blood in Olverson's left lung. Dr. Smith could not determine the distance from where Olverson was shot, but he determined that the wound did not resemble a shotgun wound. No bullet or casing was ever recovered.
Dunn's sole witness was his brother, Thomas Dunn, Jr, who testified that Dunn was supposed to have visited with him to attend an "Oldies but Goodies" concert in Cleveland. He was under the impression that Dunn was going to stay a few weeks. Thomas Dunn further testified that when Dunn would come to visit, it was customary for Dunn to bring with him clothes, shoes, and hygienic supplies.
At the close of Dunn's case in chief, the State dismissed the gun specifications attached to the intimidation charges, and dismissed one of the intimidation charges on a failure of proof.
The jury returned a verdict of guilty for the charge of involuntary manslaughter and intimidation of a witness, with a gun specification attached to the involuntary manslaughter conviction. Dunn filed a motion for a new trial on January 31, 1997, alleging that the jury was the result of a jury selection process that systematically and intentionally excluded persons under the age of forty-five years, persons from all but an isolated area in the county, and African-Americans. On February 6, 1997, the trial court imposed consecutive sentences of ten years imprisonment for involuntary manslaughter, three years for the accompanying gun specification, and five years imprisonment for the intimidation conviction. On November 6, 1997, the trial court overruled the motion for a new trial and found that the jury selection process had conformed to the standards set in the Ohio Revised Code and that no "distinctive group" of persons had been systematically and intentionally excluded. The trial court based its decision upon the decision by Judge Dennis J. Langer in State v. Hagler
(February 14, 1997), Montgomery C.P. No. 96-CR-2272, unreported. Dunn appeals, raising six assignments of error. We will now discuss the first two assignments of error together, as they are interrelated.
I.
 Appellant was denied his rights under the Sixth and Fourteenth Amendments of the United States Constitution in that he was denied the selection of a jury from a representative cross-section of the community, that being an essential component of the Sixth Amendment right to a trial by jury.
 II.
 The lower court committed reversible error in failing to take affirmative steps to ensure a representative cross-section of the community in Appellant's jury and in overruling Appellant's motion for a new trial challenging his jury array.
 During voir dire, it became apparent that within the venire there were "clusters" of people who resided in the same zip code, and a few members who were neighbors. Dunn's trial counsel contested the selection process used for jury panels in Montgomery County at the time of Dunn's trial. A formal hearing was not held in this case, but the trial court relied upon the Montgomery County Common Pleas Court's decision in Hagler, supra, in reaching its decision. This court allowed the record to be supplemented with the transcript of the hearing held in Hagler, supra. From that hearing, the following was determined:
In 1996, and in anticipation of the millennium and the potential programming problems relating to the computerized dating of events, the Montgomery County Board of Elections implemented a new computer system. A "flat file" was generated from this system by the Board of Elections, providing an annual list of citizens registered to vote in the preceding general election. Under R.C.2313.08, ten percent of the total voting population is randomly selected from the flat file for jury service in the Montgomery County Court of Common Pleas.
In November of 1996, the Data Processing Section of the Montgomery County Auditor's Office requested a copy of the flat file. Unlike the past years, the list was unexpectedly generated in alphabetical order. Data Processing Computer Programmer John Florea applied various utilities and programs to the list to intentionally randomize it. One such program was "JUR010," which extracted the 35,733 voter names from the flat file and took only the voter names with a voter identification number ending with the digit "five," and placed them into the annual jury list for 1997. This "key number" system, which has been used for many years in Montgomery County, allowed for a random method of selection, as the voter identification numbers contain no information regarding the age, race, religion or zip code of the voter.
Concerned that the 1997 annual jury list was not adequately randomized, Florea applied a "hyper-sort" utility program, trying ten different "sort" keys. The "hyper-sort" program was not used in an attempt to exclude or include any group based upon any classification, inter alia, race, age, gender, or zip code. Florea then applied three other programs to the annual jury list: "JUR015" which had reformatted the list to ensure the prospective jurors were listed in the order of first, middle and last names; "JUR030" which had enabled the list to be printed; and "JUR020L" which had assigned the prospective jurors on the annual list to eighty-three different panels.
Despite Florea's intent to produce a randomized list, these "hyper-sort" programs "sorted" and organized the data as opposed to randomizing it. As a result, this "clustering" or grouping of prospective jurors occurred in the annual jury list and in the grand jury and petit jury panels subsequently drawn from it.
The panels were drawn on December 4, 1996, in the presence of the two jury commissioners; Judge John Petzold; Gregg Findlay, Chief Deputy of the Montgomery County Clerk of Courts; Stephanie Neal, Jury Clerk for Montgomery Count Common Pleas Court; Kay Crone, Team Supervisor for the Common Pleas Jury Management Unit and Civil Case Flow Unit; and a representative of the Montgomery County Sheriff's Office. Neal mailed summonses and questionnaires to the prospective jurors, one panel at a time. In mid-December, Neal noticed an unprecedented and unusually high amount of prospective jurors requesting an exemption for being over the age of seventy years. Neal immediately alerted her supervisor, Crone, to the oddity.
On December 17, 1996, Crone advised Judge John Kessler, Administrative Judge for the Montgomery County Common Pleas Court, that the venires appeared to be "clustered by age." Judge Kessler ordered Court Administrator James Drubert to investigate the matter, and he also instructed the court's law clerk to conduct legal research to determine whether any applicable statutes or rules had been violated.
During the remainder of December of 1996 and early January of 1997, Neal and Crone received more requests for age exemptions arriving on subsequent panels. They also noticed groupings of zip codes within the panels.
The court's law clerk completed a memorandum to the court on January 7, 1997. She concluded through her research that the statutory scheme was constitutional, and that the panels had not violated any statutes or rules. That same day Judge Kessler presided over the monthly meeting of the Montgomery County Common Pleas Court judges. He advised the other judges of the situation, and had made available the research completed to reach his conclusion. The judges met an additional two times in January to discuss the problem. The judges were advised to use their discretion in addressing the problem.
During this time, Drubert and members of Data Processing developed a computer program to re-randomize and re-draw the remaining panels that would begin serving on February 24, 1997. The judges approved the plan to reconstitute the remaining venires, and a draw of sixty new panels was performed on February 7, 1997. In the interim, as of February 3, 1997, each judge was provided with two panels from which to select its petit juries in order to broaden the cross-section of potential jury members.
The investigation eventually uncovered the root of the problem: Florea, who had tried to randomize the annual list, had actually alphabetized jurors in groups according to the first three digits of their voter registration numbers. This resulted in a higher ratio of elder voters, because they have lower registration numbers. This also resulted in clustering of zip codes, due to voters having registered at their precincts and these groups of registrations having been forwarded to the Board of Elections.
The defense's expert witness, Daniel Voss, was a statistician who testified that the chances of the jury panels exhibiting a fifty percent cluster of people over the age of fifty-five was one in a billion. However, Voss conceded that the key number system used in Montgomery County had resulted in an annual jury list that was representative of the distribution of voters.
The trial court in Hagler held that there was no direct evidence that any racial group was systematically and intentionally excluded from the flat file, the annual jury list, or the jury panels. Furthermore, there was no evidence that potential jurors were intentionally excluded on the basis of gender, religion, or ethnic origin from the flat file, the annual jury list, or the jury panels.
The trial court in Hagler, in its February 14, 1997 decision, stated that although there was a failure of random jury selection under R.C. Chapter 2313, that does not by itself invalidate the jury array. Although persons were excluded on the basis of age and geographical location because of the computer error which had produced a non-random pattern of zip code clustering and the over-representation of persons over the age of fifty-five, the trial court pointed out that Hagler had failed to demonstrate that the systematic age-based and geographic-based group exclusion had been intentional. Additionally, Hagler failed to show he would have been prejudiced from the imbalance in his panel.
In this case, the trial court noted before voir dire began that two panels from two different judges had been made available from which Dunn's jury would be chosen. During voir dire, it became apparent that several members of the venire were familiar with each other, and that some were neighbors. Approximately one and a half hours into voir dire, Dunn expressed his concerns that there were no African-Americans on the panel, and he had requested that another panel be called. His concerns surrounded the fact that the panel seemed to be made up of people from the same socioeconomic group, and the fact that some of the venire persons knew each other.
Thereafter, an in-chambers discussion occurred. Kay Crone was present, and she provided a synopsis of the computer problems leading to the sorting of voter registration numbers. She explained that the error was not intentional, and that the same random selection process had been used as in the past in Montgomery County. The trial court noted that there were six zip codes representing twenty-one people on the venire, and that the lack of minority representation did not automatically mean that the panel was invalid, especially because the overall system had included minorities. Dunn noted his concerns on the record that because members of the panel knew each other and lived near each other, there would be a "loss of any sort of independent juror activity in deliberation."
The trial court overruled Dunn's objections and found that the panel was not invalid simply because it did not contain minorities. The trial court further found that the panel selection process was completed in accordance with the Ohio Revised Code. The in-chambers discussion terminated, and the questioning of the venire resumed. Dunn continued to question the potential jurors as to whether they could maintain independent thought, and whether it would be difficult for them to disagree with "their neighbors." Incidentally, Dunn passed on his third peremptory challenge.
Turning to the merits of the assigned errors, Dunn argues that the panel from which his jury was selected was systematically programmed, resulting in the lack of representation from a fair-cross section of the community, and therefore a new trial is warranted.
The State argues that Dunn failed to timely challenge the jury array. Under Crim.R. 24(E), any challenges to a jury array "shall be made before the examination of the jurors[.]" The State argues that failure to comply with Crim.R. 24(E) results in waiver of the party's right to assign error on appeal as to any challenges to his jury. However, since Dunn did object duringvoir dire in this case, and the trial court addressed his objection, we will address the merits of his assignments of error.
The Sixth and Fourteenth Amendments to the United States Constitution guarantee defendants a right to have a jury chosen from a fair cross-section of their community. Duren v. Missouri
(1979), 439 U.S. 357; State v. Puente (1982), 69 Ohio St.2d 136,138. However, this requirement of a fair cross-representation of the community need not be interpreted to mean that the array of the members of the venire consist of an exact cross-section of the community. Swain v. Alabama (1965), 380 U.S. 202; State v. Wilson
(1972), 30 Ohio St.2d 199, 202, 59 Ohio Op.2d 220, 222. Furthermore, as the Ohio Supreme Court stated in State v. Strodes
(1976), 48 Ohio St.2d 113, 115-116, 2 Ohio Op.3d 271, 272, vacated as to the death penalty (1978), 438 U.S. 911,
 Under the United States Constitution, a defendant is entitled not to a perfect cross section of citizens for the jury panel, but only to panels selected by the best method that thoughtful men, who are cognizant of the practicalities of selection and the inherent problems involved, have been able to develop. State v. Johnson
[(1972), 31 Ohio St.2d 106]. * * * The use of voter-registration lists as the source of names of prospective jurors is not unlawful even though it results in the exclusion of nonvoters. United States v. Kelly (1965), 349 F.2d 720. Unless prejudice to the defendant or the systematic and intentional exclusion of a group is shown, we will not reverse a judgment because of minor and technical defects in jury-selection procedures.
 To prove that a violation of this fair-cross section requirement has occurred, a defendant must show:
 (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.
 Duren, supra, at 364.
The first issue we must examine is whether Dunn's excluded groups are constitutionally recognized as "distinctive" groups in the community. Dunn alleges that two "distinctive" groups were excluded from the venire from which his jury was selected: (1) African-Americans, and (2) persons from all but an isolated geographical area in Montgomery County. It is indisputable that race is a constitutionally recognized distinctive group deserving of protection. Lockhart v. McCree (1986), 476 U.S. 162, 175. However, we are unconvinced by Dunn's argument that individuals who reside in an area of the community outside a common zip code are a distinctive group.
The United States Supreme Court has stated that they "impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive group in the population." Taylor v. Louisiana (1975), 419 U.S. 522, 538. Although the United States Supreme Court has declined to define "distinctive group," it has stated that:
 In our view, groups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors * * * are not "distinctive groups for fair-cross-section purposes.
 Lockhart, supra, at 174.
Other courts have attempted to define "distinctive groups." The Third Circuit has held that geographic location is not a "distinctive group" for cross-section analysis unless the group is "profoundly culturally distinct." Zicarelli v. Dietz (C.A.3, 1980), 633 F.2d 312, 320. Other circuits have made similar determinations. United States v. Foxworth (C.A.1, 1979),599 F.2d 1, 4 ("It can hardly be asserted that the registered voters in a given city or town are sufficiently `distinct' to constitute a cognizable group"); Cobbs v.Robinson (C.A.2, 1975), 528 F.2d 1331, 1336 ("Residents of the City of Bridgeport are also not necessarily a cognizable class.")
Based upon the preceding discussion, we cannot find that persons from all but an isolated area in the county is such a "distinctive group." As such, this theory fails and we need not further evaluate this group under the Duren analysis.
We also note that Dunn makes a passing argument that his venire lacked representation of persons under the age of fifty-five. Many federal courts have found that age does not constitute a distinctive class, as people of the same age neither share interests, attitudes nor experiences unique from the rest of the community. United States v.Musto (D.C.N.J. 1982), 540 F. Supp. 346, 355. See also,United States v. Potter (C.A.9, 1977), 552 F.2d 901, 909;United States v. Test (10th Cir. 1976), 550 F.2d 577, 593;United States v. Ross (C.A.9, 1972), 468 F.2d 1213, 1217, cert. denied (1973), 410 U.S. 989. For that reason, we reject Dunn's argument that age is a distinct group.
Returning to the Duren analysis, Dunn must next demonstrate that the representation of African-Americans in venires from which juries were selected was not fair and reasonable in relation to the number of African-Americans in the community. This element requires Dunn "to demonstrate the percentage of the community made up of the group alleged to be underrepresented, for this is the conceptual benchmark of the Sixth Amendment fair-cross-section requirement." Duren, supra, at 364. However, in this case there were two venires available to Dunn, and it is unclear from the record what the racial compilation of either venire was. Dunn has provided no evidence of the statistical breakdowns of African-Americans on the panels available to him, and Dunn failed to provide evidence that the other panels drawn from the total voting population had consisted of a proportionately lower percentage of African-Americans than that represented in the community. In fact, the trial court in Hagler found that Hagler's panel was "racially balanced." Hagler, supra, at 13.
Despite not fulfilling the burden under Duren's second prong, we will continue and evaluate Dunn's claims under Duren's third prong. Dunn argues that the application of the "hyper-sort" program resulted in a "systematic exclusion" of African-Americans from his panel. We are unconvinced that Dunn has shown that African-Americans were excluded from his panel. The record inHagler, supra, reflects that ten percent of the total voting population was randomly selected from the flat file for jury service in 1997. The "key number" system used to select members using voter identification numbers for compilation of the flat file was random, and in fact no information of race was disclosed nor could it be determined by the voter identification numbers. Thus, despite the application of the hyper-sort program, race was not an apparent classification that would be sorted.
Even if we were to have found that African-Americans were excluded from Dunn's panel, that is not the standard under Duren,supra. The court in Duren focused on exclusions within the entire jury selection process, and not necessarily only on one panel. Id. The Duren Court also stated that systematic exclusion means that the exclusion of the group is "inherent in the particular jury selection process utilized." Id. at 366. The Court held that the exclusion of a group from a venire is not systematic if done only several times, but would be classified as systematic if the exclusion was "weekly." Id. Dunn has provided us with no evidence that African-Americans had been excluded from the entire jury selection process, and in fact the presence of African-Americans on Hagler's panel directly disputes this allegation.
Moreover, Ohio courts have defined "systematic" as "the intentional exclusion of a distinctive group." Malloy v. KraftGeneral Foods, Inc. (June 14, 1999), Franklin App. Nos. 95 CA 241, 96 CA 245, unreported, citing State v. Moore (1998),81 Ohio St.3d 22, 28; State v. Glenn (1986),28 Ohio St.3d 451, 454; and State v. Johnson (1972),31 Ohio St.2d 106, 114. The Franklin County Court of Appeals in Malloy, supra, defined a systematic error as "`an error that is not determined by chance but by bias.'"Id., quoting Webster's Ninth New Collegiate Dictionary (1987), 1199.
Finally, in discussing the jury selection process, the Franklin County Court of Appeals held:
 It has never been held under either the Sixth Amendment right to a fair and impartial jury or under the Fourteenth Amendment guarantee of equal protection of the laws that a defendant has a constitutional right to have a member of his race represented on the jury panel.
 State v. Towns (Dec. 10, 1991), Franklin App. No. 91AP-310, unreported, citing Taylor v. Louisiana (1975), 419 U.S. 522; Fay v. New York
(1974), 332 U.S. 261; Strauder v. West Virginia
(1880), 100 U.S. 303. Moreover, it is entirely possible that Dunn could have faced a homogeneous venire without the hyper-sort program applied to the flat list, as noted by the Towns court that "random selection of jurors from the pool of prospective jurors will, in rare circumstances, result in a racially homogeneous venire." Id.
In this case, Dunn has produced no evidence of error by bias resulting in the intentional and systematic exclusion of African-Americans from the jury selection process in January of 1997. The process was completed in compliance with the Ohio Revised Code and in accordance with Duren, supra. We therefore find that Dunn has failed to demonstrate that African-Americans were systematically excluded in the jury selection process.
Accordingly, Dunn's first and second assignments of error are overruled.
III.
 The court committed reversible error in disallowing the production of evidence that would have been damaging to the State of Ohio and beneficial to Appellant.
 Dunn argues that it was error for the trial court to refuse to admit into evidence the two Smith Wesson revolvers found in Yarbrough's apartment on November 22, 1996. Dunn finds great significance in the fact that Jones was present at Yarbrough's apartment at the time the officers discovered the revolvers, and that the revolvers each contained one spent shell. Dunn contends that this evidence was relevant under Evid.R. 402, because the shell casing from the bullet killing Olverson was never discovered, and because it was likely a revolver, not an automatic, that killed Olverson. Dunn argues that finding these two revolvers within a month of the crime in the same apartment complex where the crime was committed, and in the presence of two of the main witnesses to the crime was relevant information and should have been divulged to the jury.
Evidence. R. 401 states that relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 402 provides that:
 All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio. Evidence which is not relevant is not admissible.
The staff notes to Evid.R. 401 state:
 Relevancy is not an inherent characteristic of any item of evidence. When it exists, it is a relationship between an item of evidence and a matter properly provable in the case. Evidence is relevant when it tends as a matter of common experience and logic to prove a matter of consequence. In the rule "of consequence to the determination" is an expression of materiality. The rule expresses the usual and general concept of relevancy.
 The admission or exclusion of evidence rests in the trial court's sound discretion. State v. Sage (1987), 31 Ohio St.3d 173 . The phrase "abuse of discretion" connotes more than an error of law or judgment. It implies that the trial court's action was unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
At trial, the evidence showed that on October 15, 1996, Dunn had become involved in an altercation with Olverson, and thereafter Olverson had been shot. No weapon was recovered, and no shell casing was ever discovered. Moreover, Dr. Smith testified that Olverson's wound was "a typical gunshot entrance wound." Dr. Smith further opined that Olverson had not been shot by a shotgun based upon the size of the entrance and exit wounds and the lack of debris from slugs disbursing. Dunn now attempts to claim a relationship between Olverson's death and the two revolvers.
We do not agree, and find that the trial court properly sustained the State's objection because the evidence was not relevant under Evid.R. 402. There is no rational connection between Olverson's death on October 15, 1996 and the revolvers found in Yarbrough's home more than one month after the shooting. Dunn has offered no evidence linking the revolvers to the shooting, but he claims that because each revolver had one spent round, the revolvers might have been used in Olverson's shooting. This does not equate to a relationship between the murder weapon and the revolvers, and it does not prove that someone other than Dunn shot Olverson.
Furthermore, Dunn tried to make a connection between Jones' presence in Yarbrough's apartment on November 22, 1996 when the contraband was discovered, and the fact that Jones was in the apartment complex at the time Olverson was shot. However, we do not see this as proof that someone other than Dunn shot Olverson, especially because there is sufficient evidence in the record that Jones was inside Rowe's apartment at the time of the shooting with his girlfriend, Kiona Rowe. The record also reveals that Jones' cousin, Rahsian Sargent, was outside with Jones the evening of October 15, 1996, and heard the altercation between Olverson and Dunn. After the altercation, Sargent and Jones walked into the Otterbein apartments, and Sargent watched as Jones entered Rowe's apartment. Moreover, Rowe testified that when she had heard the shot outside, Jones and her daughter had been sitting on her couch inside her apartment.
Finally, Dunn concedes that the trial court denied admission of the testimony of the officers who discovered the revolvers based upon Dunn's failure to properly disclose these witnesses under Crim.R. 16(B)(1)(e). When a party withholds the name of a witness, Crim.R. 16(E) provides that the trial court may order further discovery, grant a continuance, or prohibit the testimony of that witness. The Ohio Supreme Court has held that such testimony is admissible only if it is shown that the failure to disclose the witness's identity was not willful, that foreknowledge would not have benefitted the unknowing party, and that the unknowing party was not prejudiced by the admission of the evidence. State v. Heinish (1990), 50 Ohio St.3d 231, syllabus. In this case, there is no evidence that the failure to disclose the witness was not willful. Without question, the testimony would have prejudiced the State. Accordingly, the trial court appropriately denied the admission.
In this assignment of error, Dunn also argues that if the trial court denied the admission of the officers' testimonies, that Dunn was denied ineffective assistance of counsel. However, based upon the previous discussion, we would deny Dunn's ineffective assistance of counsel argument, since it was proper for the trial court to overrule the admission because the evidence was not relevant.
Dunn's third assignment of error is overruled.
IV.
 The lower court committed reversible error in failing to exclude prejudicial hearsay and in failing to give a curative instruction on prejudicial hearsay which was disallowed by the court but heard by the jury nonetheless.
 Dunn claims that the trial court committed reversible error when it sustained the following objection without providing a curative instruction for the jury to disregard the statements:
 THE WITNESS: I turned around and my friend asked me, my friend Denise asked me if I was going to see outside and I went back to the front. When I got to the front, my niece came in and told me that —
MR. DEWAR: Objection.
 THE COURT: Overruled. Go ahead. Your niece told you what?
 THE WITNESS: She came in and said, Aunt Sissy, she said he just got shot. I said who just got shot. She said Jacques. I asked her who shot him, and she said it was Johnny.
MR. DEWAR: Objection.
THE COURT: Sustained.
(Tr. 118)
At the time the trial court sustained the objection, Dunn did not request that a curative instruction be given, thus any error was waived. State v. Sibert (1994), 98 Ohio App.3d 412, 424. We find it likely that Dunn's trial counsel adopted a deliberate strategy of ignoring this testimony in an attempt to minimize and not emphasize its impact upon the jury. Additionally, the trial court's failure to give an instruction does not rise to plain error as such instruction would not have changed the outcome of the trial, as discussed further in addressing Dunn's sixth assignment of error.
As such, Dunn's fourth assignment of error is overruled.
V.
 The lower court committed reversible error in allowing evidence to be heard by the jury that Appellant had a Dayton Police Department number.
 Dunn argues error in the following direct testimony of Det. Davis, as elicited by the State:
 Q. * * * Did you, did you know Johnny Dunn before this case came up?
A. No.
Q. Had you heard anything about Johnny Dunn?
A. No.
 Q. Was he ever targeted as a big drug dealer, a problem drug dealer if you know?
MR. DEWAR: Objection.
THE COURT: Overruled.
A. No.
Q. He was not?
A. Not that I know of.
 Q. Did he have a DPD number, Dayton Police Department number?
MR. DEWAR: Objection.
THE COURT: Overruled.
A. Yes, he did.
 Q. Was he — well, you said you didn't know him before this?
A. Right.
(Tr. 320)
Dunn argues that this line of testimony was not only irrelevant, but highly prejudicial, because it attempted to introduce other acts testimony which is barred under Evid.R. 404(B). However, we find that the trial court did not abuse its discretion and that Dunn failed to demonstrate prejudice. The comments at issue were brief, and it is a reaching statement by Dunn that they were made in an effort to reveal Dunn's past record. No details were mentioned, and no explanation was provided to the jury regarding what a "number" was and what effect that had on a person.
Furthermore, we agree with the State that Dunn mentioned during his opening statements that he and Olverson were rival drug dealers. The State argues that this testimony at issue was created to rebut Dunn's theory that Dunn was "picked out to take the fall for this case and it is simply convenient to eliminate one drug dealer." We further find that based upon this theory, the testimony was not prejudicial because Dunn attempted to theorize that he was a rival drug dealer to Olverson, thus portraying to the jury that he was a criminal.
Accordingly, Dunn's fifth assignment of error is overruled.
VI.
 The trial court committed prejudicial error by depriving Appellant due process of law as guaranteed by the Fourteenth Amendment of [the] United States Constitution and by comparable provisions of the Ohio Constitution by entering a verdict of guilty as such verdict was against the manifest weight of the evidence.
 In considering Dunn's last assignment of error, we note that in a manifest weight of the evidence argument, an appellate court:
 Review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
 State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. While Thompkins
explicitly permits this court to consider credibility when confronted with an argument that the verdict is against the manifest weight of the evidence, such consideration is not unbounded. We have explained the limited role of an appellate court in reviewing issues of credibility in weight of the evidence challenges as follows:
 Because the factfinder, be it the jury or * * * the trial judge, has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness. Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion. Therefore, although this distinction is not set forth in Thompkins, supra, we conclude that a decision by a factfinder as to which testimony to credit, and to what extent, is a decision that is entitled to greater deference than the decision as to how much logical force to assign an inference suggested by that evidence — in short, how persuasive it is.
 State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288, unreported. Mindful of these principles, we turn to the merits of this assignment of error.
Dunn argues that the State's witnesses were not credible to support a verdict of guilty for his convictions. Specifically, he contends that there were conflicts in the State's witnesses' testimonies, and that some of the State's witnesses were incredible. We note that this court is not permitted to disturb the jury's choice between witnesses and their conflicting testimony "unless it is so incredible that it defies belief."Fairborn v. Boles (May 15, 1998), Greene App. No. 97 CA 110, unreported. See, e.g., City of Dayton v. Versic (Mar. 15, 1996), Montgomery App. No. 15223, unreported.
As this court stated in State v. Walden (Sept. 12, 1997), Montgomery App. No. 15956, unreported, "our authority to consider witness credibility is `extremely restrained,' and we may substitute our judgment for the trier of fact's only where `it is patently apparent that the fact finder lost its way.'"
After reviewing the transcript and exhibits in this case, we do not find it patently apparent that the jury lost its way. First, with regards to the charge of intimidation of a crime victim, R.C. 2921.04(B) provides that: "No person, knowingly and by force or by unlawful threat of harm to any person or property, shall attempt to * * * intimidate, or hinder the victim of a crime in the filing or prosecution of criminal charges * * * or witness involved in a criminal action or proceeding in the discharge of the duties of the * * * witness."
There is testimony from Yarbrough that after the shooting occurred, Yarbrough exited her apartment in search of crack cocaine. As she re-entered the building she heard Dunn state that "if his name came up to the police, he would be back to spray [i.e. `shoot up'] the whole building." This testimony was elicited on direct examination, and Yarbrough admitted in the presence of the jury that she was in search of crack before she heard Dunn make this comment. The jury heard all of the circumstances surrounding this testimony, determined that Yarbrough was credible, and convicted Dunn on the intimidation charge.
Second, regarding the charge of involuntary manslaughter, Dunn was charged under R.C. 2903.04(A), which states, "No person shall cause the death of another * * * as a proximate result of the offender's committing * * * a felony." The underlying felony in this case was the felonious assault of Olverson with a firearm. Dunn provides us with examples of incredible and contradictory testimony in support of this assignment of error. One such allegation was that Det. Davis "forced" Burks to testify the way he "needed [her] to testify." We disagree with Dunn, and find that Burks reiterated the events and estimated times of the events as accurately as she could recall. The jury heard testimony that Det. Davis worked with Burks in order to have her provide him with a statement of what had happened on October 15, 1996. We can detect no "force" on behalf of Det. Davis, and apparently the jury did not, either.
Similarly, Dunn's other allegations of incredible testimony were presented to the jury. Again, the jury heard all of the evidence, especially that which Dunn now claims was incredibly contradictory, yet the jury convicted Dunn.
We also find that Dunn's conviction was supported by testimony from the numerous State's witnesses whose corroborative story provided support that Dunn had shot Olverson. Yarbrough, Jones and Perry all witnessed Dunn's presence in the courtyard outside the Otterbein apartments on the evening before Olverson was shot. All three witnesses heard Dunn become increasingly argumentative with Olverson after a bottle was thrown at Dunn, and after Olverson would not tell Dunn who had thrown it. Upon Dunn leaving the group, Yarbrough heard Dunn state that he "would be back." Det. Davis testified that Jones had also told him that Dunn had stated that he "would be back."
Yarbrough returned to her kitchen, and shortly thereafter heard someone outside shout "Johnny's back" and that "he's got a gun." A shot was heard, and then Yarbrough overheard Dunn ask "now who can't hang with the big dogs?" Olverson immediately replied, "Why me?" At this point, Perry also heard Dunn state "that's what you get with fucking with JYD" and she watched as Dunn entered a car. Before Dunn drove away, Perry heard Dunn yell, "If anybody tells, I'm going to come back and spray [i.e. `shoot up'] the whole building." Moreover, Jones and Rowe testified that Olverson, who had burst into Rowe's apartment immediately after being shot, had made a dying declaration that Dunn had shot him.
Additional corroborative evidence was provided by Burks, who was supposed to be Dunn's alibi witness. Upon arriving at Burks' parents' home at approximately 9 p.m. and just after the time in which Olverson was shot, Dunn informed Burks that he had been in an altercation. Burks questioned Dunn if he had beaten up someone, and Dunn replied, "No, worse. I disciplined someone." Burks testified that the next day, Dunn had asked her to "help him out" and "tell the truth" to the police that he had been with Burks all evening long. Burks testified that she had not lied for him, and that she had told the truth that Dunn had not been in her presence between 7 and 9 p.m. on the evening of October 15, 1996, right about the time that Olverson was shot and killed.
Finally, as the State points out, Dunn actively avoided Officer Brackett in the early morning hours of October 17, 1996, which also is evidence of his guilt.
Based upon the preceding discussion, we do not believe that the jurors clearly lost their way, nor do we find that a manifest miscarriage of justice was had when the jury convicted Dunn. As such, we find that the trial court did not abuse its discretion in overruling Dunn's motion for a new trial, and we affirm the trial court's decision.
Accordingly, the verdict is not against the manifest weight of the evidence, and we overrule Dunn's final assignment of error.
The trial court's judgment will be affirmed.
WOLFF, J. and FAIN, J., concur.